**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| STEPHEN SYMS,<br><br>                        Plaintiff,<br><br>         v.<br><br>COUNTY OF CAMDEN and GEORGE<br>LEWIS, III<br><br>                        Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 20-2073 (KMW-AMD)<br><br>**OPINION** |

Appearances:

Peter M. Kober, Esquire
1864 Route 70 East
Cherry Hill, NJ 08003
        Counsel for Plaintiff Stephen Syms

William M. Tambussi, Esquire
William F. Cook, Esquire
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
        Counsel for Defendant County of Camden and George Lewis, III

**WILLIAMS, District Judge:**

**OPINION**

**I.     INTRODUCTION**

This matter comes before this Court pursuant to the Motion for Summary Judgment

("MSJ") filed by Defendants County of Camden ("County") and George Lewis III

("Lewis")(jointly, "Defendants") in connection with Plaintiff Stephen Syms's ("Plaintiff" or

"Syms") allegations that Lewis stopped him without reasonable suspicion and illegally searched him in violation of his Fourth Amendment rights and, in addition, under *Monell*, the County's policy lead to the deprivation of his constitutional rights.    Syms opposes the Motion.    For the reasons articulated below, Defendants' Motion for Summary Judgment is granted in part and denied in part.[1]

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

Plaintiff filed a Complaint in the Superior Court of New Jersey, Law Division, Camden County under Docket No. CAM-L-560-20 on February 7, 2020.    Notice of Removal ("NOR"), ECF No. 1, ¶ 1.    Defendants removed the civil action to this Court on February 26, 2020. *See* NOR. Plaintiff filed a sixteen-count Amended Complaint [ECF No. 13] on October 29, 2020.[2]

---

[1]  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

[2]  (1) Count I: 42 U.S.C. § 1983 (West) Claim for Unreasonable Stop at 20:28:57 Hours Against Individual Defendant in his Individual Capacity; (2) Count II: 42 U.S.C. § 1983 Claim for Unreasonable Duration of Stop Beginning at 20:29:27 Hours Against Individual Defendant in his Individual Capacity; (3) Count III: 42 U.S.C. Section 1983 Claim for Unreasonable Duration of Stop Beginning At 20:36:39 Hours Against Individual Defendant in his Individual Capacity; (4) Count IV: 42 U.S.C. Section 1983 Claim for Unreasonable/False Arrest at 20:54:38 Hours Against Individual Defendant in his Individual Capacity; (5) Count V: 42 U.S.C. Section 1983 Claim for Illegal Warrantless Search at 20:36:46 Hours Against Individual Defendant in his Individual Capacity; (6) Count VI: 42 U.S.C. Section 1983 Claim for Illegal Warrantless Search at 20:55:05 Hours Against Individual Defendant in his Individual Capacity; (7) Count VII: 42 U.S.C. Section 1983 Claim for Illegal Warrantless Search at 20:59:06 Hours Against Individual Defendant in his Individual Capacity; (8) Count VIII: 42 U.S.C. Section 1983 Claim for Deprivation of or Interference with Rights Against Public Entity Defendant; (9) Count IX: 42 U.S.C. Section 1981 Claim for Violation by Reason of Infringement on Plaintiff's Right to Equal Benefit and Like Punishment Against Individual Defendant in his Individual Capacity and Public Entity Defendant; and (10) Count X: NJCRA Claim for Unreasonable Stop at 20:28:57 Hours Against Individual Defendant in his Individual Capacity; (11) Count XI: NJCRA Claim for Unreasonable Duration of Stop Beginning at 20:29:27 Hours Against Individual Defendant in his Individual Capacity; (12) Count XII: NJCRA Claim for Unreasonable Duration of Stop Beginning at 20:36:39 Hours Against Individual Defendant in his Individual Capacity; (13) Count XIII: NJCRA Claim for Unreasonable/False Arrest at 20:54:38 Hours Against Individual Defendant in his Individual Capacity; (14) Count XIV: NJCRA Claim for Illegal Warrantless Search at 20:36:46 Hours Against Individual Defendant in his Individual Capacity; (15) Count XV: NJCRA Claim for Illegal Warrantless Search at 20:55:05 Hours Against Individual Defendant in his Individual Capacity; and (16) Count XVI: NJCRA Claim for Illegal Warrantless Search at 20:59:06 Hours Against Individual Defendant in his Individual Capacity.

2

In a letter dated November 12, 2021, Plaintiff withdrew nine counts: Counts III, IV, VI, VII, IX, XII, XIII, XV, and XVI. *See* Ex. D-3 [ECF No. 35-3].    Thus, only seven Counts remain: Counts I (42 U.S.C. Section 1983 Claim for Unreasonable Stop), II (Count II: 42 U.S.C. Section 1983 Claim for Unreasonable Duration of Stop), V (42 U.S.C. Section 1983 Claim for Illegal Warrantless Search), VIII (42 U.S.C. Section 1983 Claim for Deprivation of or Interference with Rights), X (Count X: NJCRA Claim for Unreasonable Stop), XI (NJCRA Claim for Unreasonable Duration of Stop), and XIV (NJCRA Claim for Illegal Warrantless Search). Defendants filed this MSJ, Plaintiff opposed the MSJ, and Defendants filed a Reply; thus, the MSJ is ripe for disposition.

## B.    FACTS

On February 9, 2018, Defendant Lewis, a police officer employed by the Camden County Police Department ("CCPD"), operated by the County, conducted a pedestrian stop beginning at approximately 8:29 P.M., outside 1335 Browning Street, Camden, New Jersey, a street known for Controlled Dangerous Substance ("CDS") activity.    Statement of Undisputed Material Facts on Behalf of Defendants County of Camden and George Lewis III Pursuant to Local Civil Rule 56.1 ("SMF"), ECF No. 35-2, ¶¶ 1-3.    John Reed ("Reed"), also a CCPD police officer and a non-party to this action, was Defendant Lewis's partner on February 9, 2018.    SMF ¶¶ 4, 6. Lewis and Reed, both dressed in CCPD uniforms and seated in a marked CCPD police vehicle, were assigned to conduct "an assault-related directed patrol" of the 1300 block of Browning Street, due to an increase in assault-related service calls in the area.    SMF ¶ 7.    Lewis was familiar with the 1300 block of Browning Street because it is known for CDS activity, and he had previously effectuated "multiple narcotic and firearm lockups" on the street.    SMF ¶¶ 8-9.

3

The CCPD had previously received complaints about individuals loitering on and selling narcotics from the porches of homes, where they neither resided nor had permission to stand. SMF ¶ 10.

On February 9, 2018, while driving past 1335 Browning Street, Lewis claims that he observed two men, later identified as Syms and Terik Johnson ("Johnson"), "loitering" on the porch of a home.    SMF ¶ 11.    Syms disputes the use of the term "loitering," pointing to Lewis's testimony indicating that Syms and Johnson were merely standing on the porch. Syms's Statement in Response to Defendants' Statement of Undisputed Material Facts ("Resp. SMF"), ECF No. 39-1; Ex. D-13, ECF No. 35-4, at 6:18-25, 7:1.    Lewis also claims that he observed Syms and Johnson pull up their face masks, as if they were attempting to conceal their identities. SMF ¶ 12.    Syms disagrees with this statement.    While Syms restates that "Lewis observed the two males pull up their . . .mask," Syms points to Lewis's testimony acknowledging that it was cold outside, and the masks were ski-mask-style masks.[3]    SMF ¶ 12; Ex. D-13 at 7:2-20.    Another point of dispute is whether Lewis observed that all lights in the home at 1335 Browning Street were turned off, SMF ¶ 13, or only the lights in the front of the house as Lewis testified.    Resp. SMF ¶ 13; Ex. D-13 at 14:23-15:15.

Lewis's observation of two males on the front porch of a darkened residence on a street where the CCPD had recently received complaints about loiterers, coupled with the males' decision to pull up their face masks as Lewis drove by, instilled in Lewis suspicion that Syms

---

[3]  While Plaintiff specifically states that "Lewis observed the two male subjects pull up their ski mask type face masks since it was cold outside," the record only indicates that Lewis testified that it was cold outside and that the men were wearing a specific type of mask.    Ex. D-13 at 7:2-20.    The record does not establish that Lewis made the causal connection suggested by Syms.

4

and/or Johnson were engaged in, or intended to engage in criminal activity.   SMF ¶ 14.   Thus,

after "circl[ing] the block," Lewis, again, observed Syms and Johnson on the porch at 1335

Browning Street.   SMF ¶ 15.   At this point, Lewis activated his body-worn camera, stopped his

vehicle at 1335 Browning Street, and approached Syms and Johnson on foot.   SMF ¶ 16. Syms

points out that he and Johnson were not wearing masks at this point.   Resp. SMF ¶ 15; Ex. D-13

at 9:6-23, 10:14-24.

      The events leading to the stop, search, and arrest of Syms were captured by Lewis's

body-worn camera.   SMF ¶¶ 16-17.   Lewis and Reed approached Syms and Johnson who were

standing on the porch steps and, while the question is muffled in the video, Lewis asked a

question to the effect of "what's going on, guys?".   Ex. D-4 at 20:28:36.   Syms was smoking a

cigarette (or something similar) and Johnson was holding a cellular phone with two hands.   *Id.*

Syms responded and though his response is muffled, he pointed to a cup sitting on the pillar of

the porch and told Lewis that he "has the house cup and everything."   Ex. D-4 at 20:28:36-42.

Lewis asked Syms and Johnson: "Do you guys live here?" to which Syms responded, "no" and

indicated that a relative lives at the home.   SMF ¶ 18a-c; Resp. SMF ¶ 18a-c; Ex. D-4 at

20:28:51 to 20:28:54.   Lewis told Syms and Johnson to sit down on the porch steps; Syms and

Johnson complied.   SMF ¶ 18d; Ex. D-4 at 20:28:56 to 20:28:59.   Syms states that Lewis's

tone was one of command and that he did not have the option to refuse.   Resp. SMF ¶ 18d.

Lewis then asked Syms and Johnson if they have identification; Syms responded "no," and stated

that Lewis saw him come out of the house, which Lewis denied.   SMF ¶ 18f-i; Ex. D-4 at

20:28:59 to 20:29:18.   Lewis again asked for identification and Syms again stated that he did

not have identification. SMF ¶ 18j-k; Ex. D-4 at 20:29:24 to 20:29:25.   Lewis instructed Reed to

obtain Syms's information; in turn, Syms provided a false name and birthdate: Carlton Syms with a 2/13/79 birthdate.[4]    SMF ¶ m-r; Ex. D-4 at 20:29:29 to 20:30:01.

Next, Lewis questioned the two men about how long they had been on the porch and Syms responded: "Couple minutes. I just went in there [points to the house at 1335 Browning Street] and heated a tea up and then came outside."    SMF ¶ 18s-t; Ex. D-4 at 20:30:15 to 20:30:23.    Lewis asked about who lives in the home and Syms and Johnson responded: "Tanika." SMF ¶ 18u-v; Ex. D-4 at 20:30:28 to 20:30:31.    Syms points out that he explained to Lewis how he knows Tanika and that the lights in home were off because Tanika was up in her room.    Resp. SMF ¶ 18v.    Lewis indicated that he was waiting for another unit to arrive.    Ex. D-4 at 20:30:48-49.    Syms, questioning the encounter, asked Lewis: "What was the relevance behind this right here?", to which Lewis explained: "All the lights are off in the house … we've had a lot of drugs, guns on this street, and all I see is a couple people hanging on the steps, and I don't know if you live here or not."    SMF ¶ 18w-x; Ex. D-4 at 20:31:10 to 20:31:25.    Syms responded that he does not look suspicious and he was not doing anything suspicious.    Resp. SMF ¶ 18x; Ex. D-4 at 20:31:30-34.    Lewis, after asking Syms about whether he has children and Syms acknowledging that he has little kids, explained to Syms: "Okay well, that's who I care about out here, you know what I mean?"    SMF ¶ 18y-cc.; Ex. D-4 at 20:31:43 to 20:31:52.

Thereafter, Syms stated: "I mean I don't got no gun or nothin, you can search me, I don't got no drugs or nothin."    SMF ¶ 18dd; Ex. D-4 at 20:31:52 to 20:31:55.    Lewis asked Syms if he had ever been stopped like this before and Syms stated "not like this right here, standing on

---

[4] Syms falsely identified himself as "Carlton Syms" because he had an outstanding child support warrant for which he did not want to be arrested.    Ex. D-12 at 33:14–23; 44:25–45:2; 143:3–11.

the porch, not this."    SMF ¶ 18ee-ff; Ex. D-4 at 20:32:03 to 20:32:10.    Lewis again explained

the stop: "Well, it's not just the address, it's the street, man. And, we get calls all the time from

people hangin' out on porches where they don't live there, and then we knock and they say, 'Oh,

my grandmom or my aunt or somebody lives here,' and then we knock on the door and the

person is like, 'No, we don't know who they are.'"[5]    SMF ¶ 18jj; Ex. D-4 at 20:32:11 to

20:32:17.    Lewis inquired about why the two men being at the home, to which Syms responded

that they are "just chillen, waitin for somebody" and mentions a cousin (although the video is

inaudible thereafter).    SMF ¶ 18kk-nn; Ex. D-4 at 20:32:18 to 20:32:34, 20:34:05 to 20:34:15.

Lewis questioned both men about their whereabouts before arriving at Browning Street

and the smell of marijuana, to which Johnson responded that he was "smokin some weed

earlier," explaining that he had "a little bit of a dutch" in his left jacket pocket.    SMF ¶ 18mm-

pp; Ex. D-4 at 20:34:28 to 20:35:06.    The exchange between Lewis and Syms and Johnson

continued, the pertinent parts of which are outlined below:

> Lewis: "You don't have anything on you?"
> Syms: "No … [inaudible].".
> Lewis: "Is there any reason I smell weed in the area?"
> Syms: "I mean, he [referring to Johnson] just told you he was smoking… [inaudible]."
> Lewis: "Okay, because I'm gonna search both of you."
> Syms: "You could search me. I don't got no weed or nothin."

SMF ¶ 18qq-vv; Ex. D-4 at 20:35:14 to 20:35:26.    Lewis then walked past Syms (who is still

seated on the porch steps), knocks on the front door of the home at 1335 Browning Street, and

engages in the following conversation with the homeowner, Tanika:

> Lewis: "Tanika, do you know these two guys hangin out on the front porch?"

---

[5] Syms points out that he can be heard saying that he is not one of these people, telling Lewis that Tanika's last name is Carter, and, after Lewis asked if Tanika has gone to bed, indicating that it's still early and that the kids are still awake.    Resp. SMF ¶ 18jj.

> Tanika: "No"
> Lewis: "No? You don't know who they are?"
> Tanika: "No"
> Lewis: "Were they inside at all?"
> Tanika: "No, they don't come in my house"
> Lewis: "So what are they doing out there?"
> Tanika: "I don't know"

SMF ¶ 18ww-xx; Ex. D-4 at 20:35:26 to 20:36:34.   Syms agrees to most of the conversation captured between Lewis and Tanika but points out that Tanika's view was obstructed in a way that impeded her ability to see out on to the porch and she did not say "they don't come in my house," she said, "they don't come by."   Resp. SMF ¶ 18ww-xx.

*The Alleged "Unreasonable Search"*

After the conversation with Tanika, Lewis again questioned Syms about whether he had anything on him and Syms denied it.   SMF ¶¶ 20a-b; Ex. D-420:36:45 to 20:36:46.   Lewis, recapping his conversation with Tanika to Syms, then searched Syms by conducting a pat-down search (Syms counters that the search was more than a pat-down), and placing his hands in Syms's back side and pockets, locating crumbled money.   SMF ¶ 20c-g; Ex. D-4 at 20:36:49 to 20:38:25; Resp. SMF ¶ 20d.   During the search, Lewis stated that he could feel something else between Syms pants and sweatpants.   SMF ¶ 20e-f; Ex. D-4 at 20:38:26 to 20:38:35.   Next, Lewis asked Reed to confirm whether Syms and/or Johnson had active warrants for their arrest or Drug Offender Restraining Orders ("DOROs").   SMF ¶ 21.   Lewis told Syms that the system showed that he was previously charged with distribution, confirming an existing DORO for "Carlton Syms."   *Id.*   As such, Lewis handcuffed Syms and, after a search incident to arrest, allowed Syms to reach into his pants to recover a bag of crack-cocaine.   *Id.*

Syms was charged with Third-Degree Possession of a Controlled Dangerous Substance, to wit: cocaine (N.J.S.A. 2C:35-10a(1)); Third-Degree Possession with Intent to Distribute a Controlled Dangerous Substance (N.J.S.A. 2C:35-5a(1)/2C:35- 5b(3)); and Fourth-Degree Hindering Apprehension or Prosecutions (N.J.S.A. 2C:29-3b(4).   SMF ¶ 25.   On August 2, 2019, Syms pled guilty to a disorderly person's offense of obstruction of the law, under N.J.S.A. 2C:29-1A, admitting that he provided law enforcement officers with a false name.   SMF ¶ 26. John Ryan, a nationally-recognized expert in the field of police practices, conducted a thorough review of this matter and rendered a detailed report, opining that the actions of Lewis and CCPD complied with recognized police standards and training.   SMF ¶ 28.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020)("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come

9

forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a

motion for summary judgment, the nonmoving party must identify specific facts and affirmative

evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A

nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . .

. .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d

Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When

considering a motion for summary judgment, the court views the facts and all reasonable

inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita*

*Elec. Indus. Co.*, 475 U.S. at 587.

## IV.   DISCUSSION

First, the Court will address the Section 1983 unreasonable stop claim (Count I) and the

corresponding NJCRA claim (Count X).    Then, the Court will address the Section 1983 illegal

search claim (Count V) and the corresponding NJCRA claim (Count XIV).    Finally, the Court

will address the *Monell* claim (Count VIII).[6]

### A.   Section 1983 and NJCRA: Violation of Fourth Amendment Rights

Section 1983 does not create substantive rights; it only "provides a federal cause of action

for the violation of a federal right."   *Dique v. New Jersey State Police*, 603 F.3d 181, 185 (3d

Cir. 2010)(citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).   To state a claim under §

---

[6] Summary judgment as to Counts II and XI is granted.   In Plaintiff's Opposition Brief, he explicitly states that he does not oppose Defendants' argument regarding the duration of the stop.  *See* Pl.'s Opp'n Br. 8.   Plaintiff confirms this concession at the end of the brief indicating that "Counts I, V, VIII, X and XIV survive," omitting Counts II and XI.  *Id.* at 14.

1983, a plaintiff must (1) allege the violation of a right secured by the Constitution and laws of the United States, and (2) show that the alleged deprivation was committed by a person acting under color of state law.[7]    *West v. Atkins*, 487 U.S. 42, 48 (1988).

The NJCRA is modeled after Section 1983, providing a remedy for the violation of substantive rights guaranteed by federal law and New Jersey's Constitution and laws.    *Tumpson v. Farina*, 218 N.J. 450, 474 (2014); *Gormley v. Wood-El*, 218 N.J. 72, 97 (2014).    The Act provides, in pertinent part:

> Any person who has been deprived of *any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States,* or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

*Gormley*, 218 N.J.at 97 (citing N.J.S.A. 10:6-2(c)(emphasis added)).    The NJCRA "is a means of vindicating substantive rights and is not a source of rights itself."    *Id.* at 98.    The New Jersey Supreme Court explained that the interpretation given to parallel provisions of Section 1983 may provide guidance in construing the NJCRA.    *Tumpson*, 218 N.J. at 474.

### 1.    Section 1983/NJCRA Claim for Unreasonable Stop (Count I and X)

The Fourth Amendment prohibits unreasonable seizures and searches. U.S. Const. amend. IV. "'Generally, for a seizure to be reasonable under the Fourth Amendment, it must be

---

[7] The parties do not seem to address the second factor so the Court deems it undisputed and will not address that factor herein.

effectuated with a warrant based on probable cause.'"   *United States v. Brown*, 448 F.3d 239,

244 (3d Cir. 2006)(quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir.2002)).

There are, however, exceptions to the warrant requirement.   An exception relevant here was

established in *Terry v. Ohio*, 392 U.S. 1 (1968), announcing that "'an officer may, consistent

with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a

reasonable, articulable suspicion that criminal activity is afoot.'"   *Id.* (quoting *Illinois v.

Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

     Reasonable suspicion is less than probable cause but is more than a mere "hunch."

*Terry*, 392 U.S. at 27.   A court must "look at the 'totality of the circumstances' of each case to

see whether the detaining officer has a 'particularized and objective basis' for suspecting legal

wrongdoing."   *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v.

Cortez*, 449 U.S. 411, 417–18 (1981)).   "An officer's objective basis for suspicion must be

particularized because the 'demand for specificity in the information upon which police action is

predicated is the central teaching of this Court's Fourth Amendment jurisprudence.'" *Brown*, 448

F.3d at 246 (*citing Terry*, 392 U.S. at 22, n. 18).

     This fact-intensive inquiry draws on the observations of the officer as analyzed against

his training and experience.   *Id.*   Indeed, "officers [may] draw on their own experience and

specialized training to make inferences from and deductions about the cumulative information

available to them that 'might well elude an untrained person.'"   *Id.* (quoting *Cortez*, 449 U.S. at

418).   Additionally, courts have considered circumstances like a suspect's presence in a high-

crime area, presence on a street at a late hour, nervous or evasive behavior, or flight from the

police. *Brown*, 448 F.3d at 251.

Importantly, there is no Fourth Amendment violation until there is a seizure. *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000).   Thus, the Court must first determine when the seizure occurred and then "evaluate the presence or absence of reasonable suspicion," considering "only 'the facts available to the officer at the moment of the seizure.'" *Brown*, 448 F.3d at 245.   A seizure requires either physical force or, absent force, a show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991).   A show of authority, such as ordering a person to stop, may constitute a seizure if two elements are present: (i) a reasonable person would not feel free to leave; and (ii) the person actually yielded to the show of authority.   *Id.* at 625–29.

Defendants argue that reasonable suspicion existed to conduct the investigatory stop due to Syms's position on the front porch of a home in a high-crime area known for CDS activity; prior complaints of loitering on, and selling narcotics from, the porches homes without the home owner's consent; Syms and Johnson pulled their face masks up as the police vehicle drove by; all the lights in the front of the residence were off; and Syms admission that he did not live in the home.   Defs.' Br. 14-15.   Defendants further argue that Lewis, as a matter of community caretaking, had a sufficient basis to conduct the stop since police are also charged with engaging in community caretaking functions, totally divorced from detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.   Defs.' Br. 16.   Defendants also rely on its expert, John Ryan, who opines that Lewis's actions were consistent with police practices and training.   *Id.*

Syms argues that the aggregate factors present here are unlike other cases where reasonable suspicion for an investigatory stop was found.   Pl.'s Opp'n Br. 5-7.   Syms, while

acknowledging that it was a high-crime area and Lewis's knowledge of the area (including having made many arrests), argues that he was still on the porch when Lewis approached him and he was not wearing a mask. *Id.* Additionally, Syms contends that the lights being off in the home and his response to Lewis that while he did not live there, he had a connection to someone in the home, were too innocuous to suggest criminal activity was afoot. *Id.* Indeed, Syms argues that a reasonable inference could be made that Syms had permission of the home's resident to stand on the porch. *Id.* Thus, when closely looking at the circumstances at the time of his detention, Syms contends that he was merely detained for being in a high-crime area. *Id.* Syms further argues that the community caretaking doctrine allows police with a non-law enforcement purpose to seize or search a person or property for the safety of the public and the doctrine is inapplicable since Lewis's investigation was for law enforcement purposes. *Id.* at 3.

Here, a reasonable jury could conclude that the facts available to Lewis at the moment he stopped Syms did not give rise to reasonable suspicion that Syms was engaged (or about to engage) in criminal activity. As an initial matter, it is undisputed that the investigatory stop occurred when Lewis told Syms and Johnson to sit down on the porch steps. *See* Defs.' Br. 14 (stating Lewis had developed a reasonable basis to continue a legal investigatory stop by asking both Syms and Johnson to sit down on the porch steps). Thus, reasonable suspicion must be assessed based on the totality of circumstances preceding this moment. *Brown*, 448 F.3d at 245. The articulated and undisputed facts giving rise to Lewis's alleged reasonable suspicion that criminal activity was afoot are: (1) the high-crime area; (2) Lewis's specialized knowledge of resident complaints about loitering and selling narcotics from their front porches; (3) Syms loitering/standing on the porch of home where the front lights were off; (4) Lewis's observation

14

of Syms pulling his mask up when Lewis initially drove by the residence in a marked police vehicle; and (5) Syms's denial that he lived at the home.

However, considering the facts raised by Syms and drawing all reasonable inferences in his favor, the Court finds that a jury could consider those facts and determine same ambiguous or innocuous or that Lewis was acting on a mere "hunch." First, although this was a high-crime area plagued with narcotics transactions, Lewis does not indicate witnessing Syms engaged in suspicious criminal-like activity – like a hand-to-hand transaction. Second, it was a cold February night and, according to Lewis, Syms and Johnson were wearing masks generally worn in the cold. Hence, it is not unreasonable to infer that Syms and Johnson were adjusting their masks due to the elements. Moreover, after circling the block, Lewis saw that Syms and Johnson were still on the porch and when Lewis approached them, he fails to raise the fact that both men were maskless and neither Syms nor Johnson made any attempt to shield their face in anyway. *See, e.g., United States v. Harrison*, No. CR 17-228, 2018 WL 4405892, at *9 (E.D. Pa. Sept. 17, 2018)(defendant's "crouching down" prior to being approach by police did not provide reasonable suspicion to stop the car, especially since when officer later spoke to defendant, he acted "normal" and "very calm."). Indeed, when Lewis approached and began to question Syms, he was smoking a cigarette (or something similar), did not appear nervous or evasive, and did not attempt to elude the police. Lewis then asked Syms two questions prior to detaining him – notably, one of the questions was not related to Syms lifting his mask when the police car rode by moments before – a general "what are you up to" type question and whether Syms lived at the home. Syms denied living at the home, as Lewis raises, but he also indicated that he knew the person who lived there. Thus, at the point of detention, Lewis had not

15

observed any suspicious transactions (other than pulling up masks – in cold weather), Syms was not obscuring his face when Lewis approached (or acting nervous, evasive, or attempting to flee), and one could infer that Syms had permission to be on the property because Lewis did not attempt to confirm otherwise before detaining Syms.   While considering Lewis's specialized experience and knowledge of the area (a "high-crime" area) and affording it great deference, the situation presented were two men on a dark porch (at 8:30 p.m. as opposed to late- to mid-night hours) instantly detained by Lewis after only two questions, neither of the responses to which necessarily supporting a finding of reasonable suspicion.   This finding is in line with a Third Circuit decision (albeit an unpublished decision) finding reasonable suspicion lacking due to ambiguous circumstances.   *See United States v. Alvin*, 701 F. App'x 151, 152-156 (3d Cir. 2017)(declining to find reasonable suspicion where law enforcement, on routine patrol, encountered an individual in a high-crime area, at a late-night hour, where the individual appeared "startled" in response to a car he identified as the police, and then hid in front of his car.).   The factual scenario presented sits on a fine line between a reasonable stop versus an unreasonable stop supported only by ambiguous or innocuous circumstances and, as such, is a matter best left for the jury's determination.[8]

---

[8] Based on this finding relating to the § 1983 claim, the NJCRA claim based on the unreasonable stop proceeds as well.   As argued by Defendant and confirmed by case law, generally, § 1983 and NJCRA would be construed the same. *Rapeika v. Borough of Fort Lee*, No. CV 19-6612, 2020 WL 6391202, at *6 (D.N.J. Oct. 30, 2020)(cursorily finding that the NJCRA search and seizure claim survived because the § 1983 claims were allowed to proceed and the analysis would be the same).   Notably, however, New Jersey courts have construed Article I, paragraph 7, of the New Jersey Constitution to provide its citizens greater protection against searches and seizures than the Fourth Amendment of the U.S. Constitution.   *State v. Novembrino*, 105 N.J. 95, 145 (1987).   Thus, it is not clear if the claims should be construed the same here.

### i.   Community Caretaking Doctrine

The community caretaking doctrine recognizes that "law enforcement officers often exercise 'community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Vargas v. City of Philadelphia*, 783 F.3d 962, 971 (3d Cir. 2015).   The doctrine "is an exception to the warrant requirement of the Fourth Amendment and allows police with a non-law enforcement purpose to seize or search a person or property 'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" *Vargas*, 783 F.3d at 971.

Here, the community caretaker doctrine is inapplicable because Lewis's actions were for an investigatory purpose.   The undisputed purpose of the stop was premised on Lewis's knowledge of crime occurring in the neighborhood and, after observing Syms and Johnson pull up their masks, his "suspicion that Syms and/or Johnson were engaged in, or intended to engage in criminal activity."   SMF ¶ 14.   The factual scenario here does not align with the facts in *Vargas* or with the Third Circuit's pronouncement therein that the doctrine can apply in situations when a seizure is for a "***non-investigatory purpose*** and to protect that individual or the community at large."   *Vargas*, 783 F.3d at 972.   Thus, notwithstanding Lewis's later pronouncement that his concern were the children in the community (which the Court has no reason to doubt), this stop was not non-investigatory in nature as the clear impetus for same was Lewis's suspicion that criminal activity was occurring.   The doctrine is inapplicable.

### 2.   Section 1983/NJCRA Claim for Illegal Warrantless Search at 20:36:46 Hours (Count V and XIV)

Warrantless searches are generally "'*per se* unreasonable under the Fourth Amendment." *Reedy v. Evanson*, 615 F.3d 197, 225 (3d Cir. 2010). There are, however, exceptions. One such exception is a consent to search, if given freely and voluntarily. *Id.* The Court will address the issue of consent first as same would obviate the need to evaluate the other arguments raised by Defendants regarding *Heck* and the constitutionality of the search.

"Whether a person consented to a search is a question of fact to be determined from the totality of the circumstances." *Kerns v. Chalfont-New Britain Twp. Joint Sewage Auth.,* 263 F.3d 61, 65 (3d Cir. 2001). The question of consent should be resolved by examining all relevant factors such as age of the accused, his education, his intelligence, whether he was advised of his constitutional rights and whether the questioning was repeated and prolonged. *United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994). No one factor is given dispositive effect. *Id.* Finally, the government is not required to advise a defendant of the right to refuse consent. *Id.*

Here, the undisputed facts establish that Syms twice stated that Lewis could search him – the first statement was unsolicited and the second was after Lewis announced an intention to search Syms. The exchange follows:

> Lewis: "You got kids out here?"
> Syms: "Na my kids, my kids live with their mother."
> Lewis: "Okay, you got young kids though?"
> Syms: "Yea, I got little kids."
> Lewis: "Okay well, that's who I care about out here, you know what I mean?"
> Syms: "I mean I don't got no gun or nuthin, *you can search me*, I don't got no drugs or nothing."

Further, after Lewis indicated that he smelled weed and Johnson admitted that he smoked earlier and had a little "dutch" in his pocket, Lewis had the following exchange with Syms:

> Lewis: "You don't have anything on you?"

18

> Syms: "No . . ."
> Lewis: "Is there any reason I smell weed in the area?"
> Syms: "I mean, he [referring to Johnson] just told you he was smoking . . ."
> Lewis: "Okay, because I'm gonna search both of you."
> Syms: "You could search me.   I don't got no weed or nothin."

SMF ¶¶ 18y to 18vv.

Syms first expresses consent three to four minutes into the stop and the second at about seven minutes.   So, at this point, questioning had not been repeated or prolonged.   Moreover, Syms was effectively communicating with Lewis, even asking him why he was being stopped. SMF ¶ 18w.   The record establishes that Syms is 40 years of age and he finished high school. Ex. D-12, 13:12-19.   There is no evidence adduced by Syms to demonstrate he suffers from any intellectual impairments.

Syms's argument as to consent is no more than a conclusory allegation that consent to search was "extracted by coercion and was offered only in submission to Lewis's showing of lawful authority."   Syms fails to meet his burden to identify specific facts and affirmative evidence for the Court to contradict those offered by the moving party.   Syms merely offers the conclusory statements in his brief with nothing more – this is insufficient to defeat summary judgment.   Indeed, the Court, having reviewed the body-camera video, notes that Lewis's tone remained even throughout the seven-minute period where Syms provided his consent twice and he did not threaten any use of force to secure the consent – again, Syms first statement providing consent occurred without Lewis even mentioning a search.   Syms fails to come forward with evidence showing that there is a genuine issue for trial on this issue.   Summary judgment is granted as to the illegal search claims; thus, the Court need not consider the other arguments presented on this issue.

**B.    Qualified Immunity**

"'Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity.'" *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021)(quoting *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)).   At the summary judgment stage, "the officer bears the burden of establishing his entitlement to qualified immunity."   *Id.*   "The qualified immunity inquiry contains two prongs: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation." *Id.* (citing *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010)).   The Third Circuit provides the following instruction for lower courts to determine whether a right was clearly established at the time of the violation:

> To determine whether a right was "clearly established," we conduct a two-part inquiry. First, we must define the right allegedly violated at the appropriate level of specificity. This requires us to frame the right in light of the specific context of the case, not as a broad general proposition. Second, we must ask whether that right was "clearly established" at the time of its alleged violation, *i.e.*, whether the right was sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is an objective (albeit fact-specific) question, where an officer's subjective beliefs ... are irrelevant.

*Id.* (citing *Peroza-Benitez*, 994 F.3d at 165)(citations and quotations omitted).

At the outset, having determined that summary judgment is appropriate on the illegal search claims, the first question in the qualified immunity inquiry – the violation of a constitutional right – is resolved and Lewis is thus entitled to qualified immunity.   *Saucier v. Katz*, 533 U.S. 194, 201 (2001)("If no constitutional right would have been violated were the

allegations established, there is no necessity for further inquiries concerning qualified immunity.")

However, regarding the illegal stop claims under Section 1983 and NJCRA, the Court determined that summary judgment is precluded due to the issue of the reasonable suspicion for the stop.   Thus, the first factor – whether there is a violation of a constitutional right – is unresolved.

Defendant argues that, based on the totality of the circumstances, Lewis, like any reasonable officer in his position, had ample reasonable suspicion to conduct a stop and, therefore, is entitled to qualified immunity.   Defs.' Br. 26.   Plaintiff argues, regarding the stop, that Syms had a right to be free of investigatory detention when present in an area of criminal activity but where an aggregate of factors arousing reasonable suspicion of criminal activity were absent.

Regarding factor two, under the circumstances of this case, it is clearly established that an individual has a right to be free from investigatory detentions where the totality of the factors presented do not establish reasonable suspicion due to the reliance on innocuous, ambiguous facts.   Here, as the presence or absence of reasonable suspicion is still an issue, the qualified immunity determination cannot be made at this juncture.

## C.   Section 1983 *Monell* Claim

"A municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*."   *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014)(citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).   A municipality may be held liable under Section 1983, if the plaintiff demonstrates that the violation of the plaintiff's

rights was caused by the municipality's policy or custom.   *Id.*   "Liability is imposed 'when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of one of its employees.'" *Id.* (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1027 (3d Cir.1991)). "Whether the plaintiff pursues a policy or custom claim, he or she must allege that 'a [city] government's policy or custom ... inflict[ed] the injury' in question," meaning the plaintiff must show "an affirmative link between the municipality's custom and the specific deprivation of constitutional rights at issue."   *Clayton v. City of Newark*, No. 21-1289, 2021 WL 6062342, at *3 (D.N.J. Dec. 22, 2021).

   *Monell* liability can also be established based on the failure to train, supervise, or discipline.   The Third Circuit explained that "[w]here the policy 'concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact.'"   *Thomas*, 749 F.3d at 222.   Moreover, "'the deficiency in the training [must have] actually caused' the constitutional violation."   *Id.*

   Defendants argue that Plaintiff's claim is not based on a failure to train or the existence of any improper custom or practice.   Defs.' Br. 27.   Instead, Syms merely asserts, without showing the existence of an actual policy, that the County "established" a policy prior to this stop to prolong investigatory stops after reasonable time has elapsed or to conduct warrantless searches of persons if said search revealed a bulging object.   *Id.*   Defendants also contend that because Lewis is not liable for violating Syms's constitutional rights, Syms's *Monell* claim against the County cannot stand because it cannot be held liable if there has been no violation.

22

*Id.* at 27-28.   Syms counters that the policy at issue here is the <u>Camden County Police</u>

<u>Department – Interview, Interrogation, Access to Counsel</u> policy.   Pl.'s Opp'n Br. 14.   Plaintiff

contends that the policy outlines a list of non-exclusive factors that may support a *Terry* stop,

without also informing officers that an aggregate of factors is required to justify the stop.   *Id.*

Thus, the policy could leave an officer with the mistaken belief that the existence of any one

enumerated factor would justify a *Terry* stop, leading to the violation of a suspect's rights.   *Id.*

In reply, Defendants contend that Syms has completely modified his *Monell* claim and seeks to

advance a misplaced and speculative position that was never raised in the Amended Complaint,

or an interrogatory response.   Defs.' Reply Br. 8.   Defendants contend that the policy, in listing

the factors to consider, in no way states that the factors would be sufficient individually to

support reasonable suspicion.   *Id.*   Indeed, Defendants point to the sentence preceding the

outlined factors which indicates that personnel must be able to point to "specific and articulable

***facts, when taken together*** with rational inferences, reasonably warrant the stop."   *Id.*

Defendants contend that Syms advances no facts establishing notice of any alleged deficiency in

the execution of the policy or that there was deliberate indifference to any such alleged

deficiency.   *Id.*

   Syms fails to meet his burden.[9]   To reiterate, once Defendants pointed to Syms's failure

to identify a policy or custom to sustain his *Monell* claim, Syms must carry his burden of going

beyond the pleadings and offering the Court specific facts showing that there is a genuine issue

---

[9] Here, the Court only addresses any alleged policy relating to the illegal stop.   Since the Court has already
determined that summary judgment is warranted as to the warrantless search claim, a *Monell* claim cannot be
maintained without an underlying constitutional violation.   *Knellinger v. York St. Prop. Dev., LP*, 57 F. Supp. 3d
462, 471 (E.D. Pa. 2014)("without an underlying constitutional violation, there can be no *Monell* claim").

for trial.   Syms has a duty to identify specific facts and affirmative evidence that contradict those offered by the moving party.   Syms relies on and produces the County's policy regarding interview, interrogation, and access to counsel to support his *Monell* claim.   At the outset, Syms's characterization of the policy and the alleged deficiencies appear misplaced and lack the support of record evidence.   The policy specifically provides that reasonable suspicion must be supported by personnel's ability to point to "**specific and articulable *facts* that, when taken together with rational inferences, reasonably warrant the stop**" and then goes on to provide a non-exhaustive list of factors that have previously supported reasonable suspicion.   No reasonable person can interpret the policy to suggest that the existence of one factor is sufficient to warrant a stop – the policy refers to specific and articulable facts (plural, not singular), "when taken together" (again, suggesting a combination of items).   Even assuming the policy is deficient and misleading, the second problem is Syms's failure to identify facts and affirmative evidence that the policy violates the Constitution or was the 'moving force' behind Lewis's actions – Syms only provides arguments, some conclusory, without citation to record evidence. Thus, the Court is left to consider the allegations in the pleadings, the policy, and Syms's arguments that the policy could be misleading and when relied on by an officer in the field would be violative of a suspect's constitutional right.   At the summary judgment stage, the Court needs more to find that Syms has sustained his burden.   Summary judgment is granted as to the *Monell* claim.

## V.   CONCLUSION

For the reasons set forth above, the Court denies summary judgment as to Syms's illegal stop claims (Counts I and X).   The Court grants summary judgment as to illegal search claims,

24

unreasonable duration of stop claims, and *Monell* claims (Counts II, V, VIII, XI, and XIV).   An accompanying Order will be entered.

Dated: September 29, 2022

KAREN M. WILLIAMS
United States District Judge

25